**.In re LONG ISLAND R. CO.**
**Bankr. No. 47970.**

United States District Court
E. D. New York.
Oct. 30, 1951.

See, also, D.C., 100 F.Supp. 999.

Shearman & Sterling & Wright, New York City (Boykin C. Wright, William W. Golub, and Joseph A. Doyle, all of New York City, of counsel), for the trustee.

Edward W. Bourne, New York City, for Long Island Transit Authority.

Conboy, Hewitt, O'Brien & Boardman, New York City (Bernard Sobol, New York City, of counsel), for the Pennsylvania R. and American Contract and Trust Co.

G. Burchard Smith, County Atty. of Nassau County, Mineola (Orrin G. Judd, New York City, Special Counsel), for Nassau County.

Lawrence E. Walsh, New York City (Philip Hodes, Asst. Counsel, New York City, of counsel), to Public Service Commission.

KENNEDY, District Judge.

These proceedings involve five features of the relationship between the debtor and the Pennsylvania Railroad (called hereafter "Pennsylvania"). In connection with two of these features the trustee asks for authority to enter into new contracts with the Pennsylvania. As for the other three, the trustee has made an examination of the relationships and has reached and reported certain conclusions which will be mentioned at the appropriate point.

1. The Floating Freight Service Contract Between Greenville, N. J., and Long Island City.

 Ever since 1895 the debtor has been floating freight for the Pennsylvania between Greenville, N. J., and Long Island City. From January 1, 1926 until the present time the Long Island has been compensated at the rate of 35¢ per ton of merchandise. It has been repeatedly asserted that the contract was unfair to the debtor and should be revised. In 1950 the former trustees retained Messrs. Coverdale & Colpitts to study the matter. An independent study was made on behalf of the New York Public Service Commission by William Wyer & Co.

Both experts were in substantial agreement on the point that the former arrangement was compensatory between 1926 and 1940, was profitable to the debtor during 1941 to 1947, and was sufficient in 1948 to cover the debtor's overhead cost and return a large profit. However, the experts were also in agreement that during 1949 the cost of performing the service took a sharp upward trend and that the debtor was losing money during 1949 and 1950. As a result of these studies and also of negotiations launched by the former trustees and continued by the present trustee, it is now proposed that the contract be revised and the debtor's charge be increased to 40¢ a ton, the Pennsylvania paying to the trustee $245,000. additional payment for floating services between March 1, 1949 and June 30, 1951. Provision is made for periodical revision of the contract on the basis of agreed standards of operating, overhead and other costs, the general idea being that the debtor is to perform the service on the basis of a cost plus 10% profit. I am satisfied that the proposed arrangement is fair and equitable, and that the trustee should be authorized to enter into the contract. I have signed an order to this effect.

2. The New York Connecting Railroad Company.

 This feature of the relationship between the debtor and the Pennsylvania is fairly complicated. A company called the New York Connecting Railroad Company (hereinafter called "Connecting") has, since 1918, exercised trackage rights over a portion of the debtor's property between Freeman Street near Fresh Pond Junction in Queens and Bay Ridge in Brooklyn. The Connecting is owned equally and jointly by the New York, New Haven & Hartford Railroad and the Pennsylvania Railroad. On December 29, 1939, with the approval of the Interstate Commerce Commission, a new contract was made (effective as of January 1, 1938) under which Connecting paid 60% of the taxes on the jointly-used property. Other taxes and interest were apportioned according to use, but with a maximum proportion against Connecting of 75%. A proportion of expenses was allocated according to use but again the proportion against Connecting was not to exceed 75%.

998

This agreement was the subject of a study ordered by the former trustees and conducted by Coverdale & Colpitts. At about the same time William Wyer & Co. made a similar analysis.

The trustee reached the conclusion based upon the opinion of both experts that the 1938 contract was in fact inequitable and should be revised. It is now proposed that commencing January 1, 1951, Connecting will pay 75% of the amount of interest on the agreed value of all jointly-used facilities, the proportion of taxes which is indicated by use, and the proportion of maintenance expense which is indicated by use. The debtor will also receive the sum of $200,000. in settlement for under-charges during 1950 only. All questions about inequities *prior* to that date are left open, and susceptible of litigation if the trustee be so advised. Consummation of the agreement will mean that some $300,000. a year will be prospectively realized in the way of additional revenue, that an inequitable ceiling on Connecting's proportion of taxes and maintenance expenses will be removed, and that either party may request renegotiation and arbitration of the terms of the agreement.

All parties interested in the estate (with the possible exception later noted) were satisfied that this temporary solution of an inequitable situation is the best that can now be devised. I, myself, feel that the new contract, while not perfect, will go far towards the equitable distribution of current and prospective expense, and I have signed an order authorizing the trustee to enter into this contract.

3. The Question Whether the Debtor's Accounting Should be Conducted in Philadelphia or in Jamaica.

■ From the beginning of the trusteeship frequent complaint has been made that Pennsylvania was overcharging the debtor for accounting services, and that anyway the debtor's books and records should be removed to Jamaica and it should have its own accounting department. A survey of this problem was made by Arthur Andersen & Co. and resulted in a report that an independent accounting system would cost the debtor $209,000. per annum more than is presently charged by the Pennsylvania for the same service. While it may be that at some future time the removal of the books and records to Jamaica and the installation of an independent accounting system will become essential, the trustee has concluded that it is unwise to incur that additional expense at this time and I agree with him.

4. The Question of Insurance.

■ The Pennsylvania at the present time insures the debtor through its own insurance department. This arrangement has been criticized, and as a result of that criticism the trustee has caused the matter to be investigated. He reports that independent coverage would impose an additional charge upon the debtor of some $50,-000. per annum. Clearly there is no advantage to be served by saddling the estate with this additional burden.

While the trustee was discussing this subject he pointed out that the former trustees carried wreck insurance in the amount of $1,000,000. with a deductible average of $400,000. At the time of the first wreck (Rockville Centre) the premium for this coverage was $13,000. At the time of the second wreck (Kew Gardens) the premium had been increased to $50,000. Thus in the space of less than a year the former trustees collected $2,000,000. in return for premiums aggregating $63,000. Now, however, the former insurer (the policy having expired) demands $150,000. per annum for wreck coverage of $1,000,000. with a $1,-000,000. deductible average.

The trustee feels that this cost is excessive, particularly in the light of the fact that probably within the life of the policy a safety system costing some $6,000,000. will have been installed. On that basis the trustee has concluded that he should not pay the premium in question but should set up a reserve at the same rate against any possible wreck. I am not sure that I would solve the problem in the same way if I were the trustee. But on the other hand I acknowledge that this is purely a matter of business judgment, and I sincerely doubt my right or power to substitute my judg-

ment in a matter of this sort for that of the trustee.

5. The Question of the Tunnel and Station Rate Paid to the Pennsylvania.

For years prior to 1949 the charge has been made that the Pennsylvania was exacting an excessive rental for tunnel and station facilities. The Public Service Commission of the State of New York made a careful study of this matter and reached the conclusion that if there was any want of equity in the present arrangement it was the Pennsylvania that suffered. The trustee agrees with this conclusion on the basis of the information in his own possession, and no facts have been developed in this proceeding up to this point which challenge the correctness of the judgment either of the Public Service Commission or of the trustee in this matter.

## Conclusion

All of the matters I have just discussed were thoroughly ventilated at a hearing attended by all parties at interest. Specific approval of the floating and connecting contracts was voiced by the counsel for Suffolk and Nassau Counties, Mr. Orrin G. Judd, who has devoted much time to the study of both matters, and indeed took a personal part in the negotiations leading to the contracts before me for approval. The Public Service Commission, however, asked and secured leave to submit certain comments on these contracts to the court which are embodied in a letter dated October 29, 1951. The commission does not oppose the trustee's entering into these agreements, but submits for future consideration (1) whether the retroactive reimbursement ($200,000.) for the year 1950 (Connecting contract) is adequate, (2) whether possible adjustments of inequities prior to that year arising from the same contract are still open and the trustee's rights preserved, (3) whether the use formula of the Connecting contract should not apply to interest as well as to taxes and operating expenses, and (4) whether the additional floating charge is large enough in the light of the fact that the harbor charges between 1921 and 1951 have increased from 60¢ to $1.18 per ton.

However, in submitting these points the commission recognizes that in negotiating disputes of this nature a certain amount of give and take must be allowed.

My own reading of the contract persuades me that the trustee's rights under the connecting arrangement prior to 1950 are in fact preserved and that there is grave dispute whether the tonnage charge for floating freight in fact varies directly as the harbor charges vary. The other two points, namely whether the 1950 reimbursement payment is or is not sufficient, and whether the straight use formula should not apply to interest as well as to everything else were purely matters of give and take— of negotiation. However, this memorandum will serve to call these matters to the trustee's attention for such action as may seem advisable to him.

Concerning all the other points mentioned in this agreement, not a single voice was raised in criticism of the decisions made and conclusions reached by the trustee.